35 253
50 792

35 253
63 807

## THE ENDOWMENT AND BENEVOLENT ASSOCIATION OF KANSAS v. THE STATE OF KANSAS.

1. STATUTE, *Valid.* Chapter 131 of the Laws of 1885 is not unconstitutional, or void.
2. LIFE INSURANCE—*Endowments—Benefits.* A contract by an association to pay at certain stated periods of time certain sums of money as endowments to living members, or in case of their death to pay certain other sums of money as benefits to their beneficiaries, is life insurance both as to the endowments and the benefits.

### *Error from Lyon District Court.*

ACTION brought by *The State* against *The Endowment and Benevolent Association of Kansas,* to oust it from the exercise of certain corporate powers and to dissolve the corporation. Judgment for The State, at the January Term, 1886. The defendant brings the case to this court. The material facts are stated in the opinion.

*J. Jay Buck,* for plaintiff in error.

*S. B. Bradford,* attorney general, and *J. W. Feighan,* county attorney, for The State.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by the state of Kansas in the district court of Lyon county against the Endowment and Benevolent Association of Kansas, to oust it from the exercise of certain alleged corporate powers, and to dissolve the corporation.   The case was tried before the court, without a jury, upon an agreed statement of facts, and upon such agreed statement of facts the court rendered judgment in favor of the plaintiff and against the defendant; and the defendant, as plaintiff in error, brings the case to this court for review.

The plaintiff, defendant in error, claims that the defendant, plaintiff in error, is exercising the powers and functions of a mutual life insurance company, in violation of chapter 131 of the Laws of Kansas of 1885.   The defendant admits that it has not complied with any of the terms or provisions of said chapter 131; but claims that it is not required to do so, and this for the following reasons, among others: *First,* the act does not apply to the defendant; *second,* but if it does, then it is unconstitutional and void to that extent.   Does the act apply to the defendant?   The defendant claims that it does not, for two reasons: (1.) It claims that the act applies only to mutual life insurance associations, and that the defendant is not such an association.   (2.) It claims that the act can apply only to such mutual life insurance associations as have been or may be organized since the act took effect, and that the defendant's organization dates from January 7, 1885, while the act did not take effect until March 14, 1885.   The whole question as to whether the act applies to the defendant, or not, we think depends entirely upon the question whether the defendant is engaged in the business of life insurance, or not. That it is an incorporated association, doing business on a

mutual and coöperative plan, with mutual rights, privileges and obligations among its members, it admits; but it claims that it is not engaged in any kind of life insurance business. Indeed, it claims that it is not engaged in an insurance business of any kind, and is not an insurance company or association of any kind. It claims that it takes no risks which may with any degree of propriety be called insurance risks; and that it makes no difference to it or to any of its members whether persons joining the association are old or young, in good health or in bad health, or whether they are likely to live long or to die soon; and, indeed, it claims that the association is nothing more than "a loaner of money." On the other hand, the plaintiff claims that the defendant is a mutual life insurance association, and nothing else. In our opinion, if the defendant is not engaged to any extent in the business of mutual life insurance, then the act will not apply to it; but if it is engaged in any such business, then the act will apply. The title to the act reads as follows: "An act providing for the organization and control of mutual life insurance associations in this state," and, of course, unless the defendant is engaged in the business of "mutual life insurance," within the meaning of this title, the act itself cannot apply to the defendant. But if the defendant is engaged in this kind of business, then we think the act will apply, and not only by the terms of this title, but also by the express provisions of the act itself. It will be seen from an inspection of the body of the act that it was the intention of the legislature that the act should apply to all mutual life insurance associations organized on the assessment plan, with a few exceptions, whether the associations were organized before the act took effect, or afterward. (See § 30 of the act.)

For the purpose of determining whether the defendant is engaged in the transaction of a mutual life insurance business, or not, we shall now proceed to consider the nature and character of its organization and the kind of business which it does in fact transact. The association is a corporation, and was organized on January 7, 1885. The charter is broad enough to authorize it to transact a mutual life insurance busi-

ness upon the assessment plan, and also upon both an endowment plan and a death or mortuary plan, if it so chooses; but of course its charter is not conclusive as to the kind of business which it does in fact transact. But the kind of business which it does in fact transact is as follows: Its general laws make all white persons, male or female, between the ages of 18 and 55, of good moral character and temperate habits, eligible to become members of the association, and the association receives such persons as members. There are two funds provided for: (1.) The expense fund. (2.) The endowment or benefit fund. The members are divided into two classes as to the amounts of the endowments or benefits; one class receiving a $3,000 certificate, the amount thereof to be paid to the member in five equal installments, if he or she lives, and in case of his or her death, as hereafter stated; and the other class receiving a $5,000 certificate, also to be paid in five equal installments, or otherwise as above mentioned for the $3,000 certificate, and all these installments are represented by coupons attached to the certificate. The membership fees, annual dues and assessments, are made larger or smaller to correspond to some extent with the amount of the endowment or benefit certificate. The members are also classified as to age, those becoming members at an earlier age paying a less amount on assessments than those becoming members at a more advanced age, and the amounts to be received by the members as endowments to become due at more widely separated periods of time. It is scarcely necessary for us to say anything further with regard to the membership fees or annual dues, or other items of the expense fund, for those items furnish but little proof as to whether the association is an insurance company, or not, or whether it does an insurance business, or not. That fund is used merely for the purpose of paying the expenses of the association. We shall therefore confine our investigation principally to the manner of creating and using the endowment or benefit fund. This fund is created by assessments upon the members, and may possibly be augmented in some rare instances by interest received on loans made from such fund.

These assessments may be made at any time, and are made upon all the members of the association; but not less than fifteen nor more than twenty-four assessments are permitted to be made in any one year. We might take any class of the members for the purpose of illustrating what we wish to say; but taking the class of youngest members — those between the ages of 18 and 25 years — and taking those whose certificates of membership authorize them to participate in the endowment fund to the extent of $5,000, and the assessment on each member will be $1.50, and each member will be entitled to receive from the endowment fund every ten years from the date of his membership $1,000, until he receives the entire sum of $5,000; that is, five coupons of $1,000 each are attached to each certificate of membership, and one of such coupons becomes due and is payable by the association to the member every ten years from the date of membership for the period of fifty years. If the member dies, however, before receiving the entire amount, his beneficiary named in his certificate of membership will be entitled to receive, not the full face value of the remaining coupons or the full face value of any one of them, but will be entitled to receive the actual value of the then-maturing coupon, to be calculated from the date of the issue thereof to the date of death, less such amounts as may possibly have been previously received by the member as a loan on such coupon. In other words, such a member, if he or she lives, will pay into the endowment fund every ten years from $225 to $360, and will be entitled to draw out of such fund within the same period of time the sum of $1,000, and will pay into such fund during the fifty years which his or her certificate of membership runs from $1,125 to $1,800, and will be entitled to draw out of the fund the sum of $5,000. If it be asked how the association can pay these large sums from such assessments, we would answer that it is not a question of law, and we cannot answer it. It would seem to us, however, that it cannot be done. It would seem to us that all possible receipts of money by the association, including payments of all kinds made by the members, and all possible

17 — 35 KAS.

interest received from loans, would not be anywhere near suf-
ficient to pay the maturing coupons.   And we would further
think that if the members of the association entertain even
the slightest hope of receiving such wonderful gains upon their
investments as the foregoing figures would indicate, there would
be but few lapses or forfeitures of memberships to assist in
saving the association from insolvency.   But there is no prob-
ability that every member will live for the period of fifty
years from the date of his first becoming a member, or for the
period of time during which his certificate of membership is
to run; and if he should die before that time, then what will
his beneficiary be entitled to receive?   The agreed statement
of facts answers this question, as follows:

"Upon the death of a member who has complied with the
rules of the association and has paid all lawful charges, as-
sessments and dues against him on the books of the association,
the association settles with his beneficiary by paying to him
the actual value of the then-maturing coupon, calculating from
date of issue to date of death, less any amount already received
on said coupon, that being the actual amount earned by said
coupon, and no more than that amount."

Is this amount which the beneficiary is to receive more
or less than the amount to be paid in by the member?
Generally, it will be very much more.   Take again, for
illustration, those members who became such at an early
age, and who hold certificates for $5,000, and the most that
any one of them can ever be assessed for any one year is $36,
while the first-maturing coupon will earn during that same
year the sum of $100; for the amount of each coupon attached
to his or her certificate of membership is just $1,000, and the
first-maturing coupon is payable in ten years.   Hence if the
member die at almost any time after the last half of the first
year and before the first coupon becomes due, his beneficiary
will be entitled to receive more than he or she has paid into
the endowment fund; much more, indeed, than the amount of
the money which he or she has paid into such fund, with in-
terest, and much more even than all that he or she has paid to
the association for all purposes, with interest.   If the member

dies at any time after the first coupon has become due, substantially the same result will follow. If, for instance, the member die at the end of forty-five years, and if the value of the maturing coupon is to be estimated from the date of issue to the date of death, and this is the agreement, then the beneficiary should receive forty-five fiftieths of the amount of the coupon, or $900; while the member could not possibly have paid into the beneficiary or endowment fund more than $360 since the last payment of a coupon, and at that time he or she had drawn out of such fund at least $3,200 more than he or she had paid in, if indeed, he or she was able to draw out of such fund all that he or she was entitled to draw. Under such circumstances, can it be supposed that the member has received anything as a loan or otherwise on the maturing coupon? And as loans are made, if ever made, upon the security of the maturing coupon, it would seldom if ever happen that a deceased member would have received at the date of his or her death all that such maturing coupon had earned up to that time; and hence, practically, in every case of the death of a member the beneficiary would be entitled to receive something, and in almost every instance to receive much more than had been paid in by or for the member, over and above the amount that had been received by him or her. But even if the value of such coupon should be calculated from the date of the payment of the last coupon, then what we have already said in connection with the death of the member during the maturing of the first coupon will apply.

What we have said with respect to the youngest members entering the association and to the $5,000 certificates, will apply with about the same force to all the other members and to both classes of certificates. Persons from fifty to fifty-five years of age becoming members of the association are assessed at each assessment $5.60, and one of their coupons becomes due every four years, and the last one becomes due at the end of twenty years. Now a member may die at any time, and if he or she dies, his or her beneficiary would in almost every instance receive a larger amount of money than the member

had paid into the association over and above what he had received, and in many instances a very much greater amount. And this amount so received by the beneficiary would go, like all benefits paid in cases of insurance, to the beneficiary as his absolute property, and would not belong to the estate of the deceased member, nor be any part of the assets thereof, nor could his or her executor or administrator control it or use it for any purpose whatever. If this is not insurance, what is it? The counsel for the association claims that the association is a mere "loaner of money." But where will it get the money to loan? It agrees to pay out to its members and their beneficiaries very much more than it can possibly receive. For instance, it assesses its members who enter the association while they are less than twenty-five years of age not to exceed $36 a year each, while it agrees to pay them at the rate of $100 a year each. It assesses its members who enter the association at the most advanced age at which the association will receive members, not to exceed $134.40 a year each, and agrees to pay them at the rate of $250 a year each. And the first coupons of this last-mentioned class of members become due and are payable in four years after such members join the association. Now can such an association have money to loan at any time after its coupons begin to fall due? And when any large number of its coupons have fallen due, must it not forever afterward be hopelessly insolvent? Of course the association might do a thriving business for four or five years and until the time when its coupons begin to become due, and perhaps it hopes that from and after that time, and just before any payments or loans are made on such of the coupons as are due or will soon become due, there will be such a vast number of forfeitures or lapses of memberships, and such a vast number of accessions of new members, that the association will be saved from the utter insolvency that would otherwise necessarily follow. But this hope of the association would probably prove illusory. Forfeitures and lapses are within the control of the members themselves, and so long as it is profitable for the members to remain in the association there will be but few for-

feitures or lapses. It is not at all probable that members will retire from the association only at a time when it is profitable to the association for them to retire. They will probably retire from the association, if they retire at all, only at time when they have just received the full payment of their matured coupons, or loans to the full amount which their maturing coupons have earned, and at times when they have nothing to lose by retiring from the association, but probably much to gain. Besides, no society should be founded upon the theory or hope of forfeitures, and lapses. No society should be founded upon the theory that those who have long been members, and have paid large sums of money into the society, shall then be crowded out and deprived of all the benefits for which they have paid their money, and new members taken in to supply their places, and possibly to undergo the same process of payments, forfeitures, lapses, and losses of benefits. We think it is clear that the money paid on the coupons, either to the members themselves while living and after the coupons have become due, or to their beneficiaries after their death, and on maturing coupons, cannot be called loans. Such payments are merely the payments of money in satisfaction of liabilities. Also, the following language from the charter and the laws of the association tends to show that the association is an insurance company and does a life insurance business, to wit:

"CHARTER.— The objects of the association are: First, to guard its members, to a great extent, against the ills of pecuniary want during life, and especially during the period of infirm old age, and at their death to make provision for their families and friends, which latter is supposed to be the only physical anxiety of dying man."

"General laws, Article IV:

"SECTION 1. Any applicant who shall make any false statement, conceal or evade any fact, in regard to their personal history, or present condition of health, shall forfeit all benefits they may appear to have gained by becoming a member of this association.

"SEC. 2. Each applicant for membership must sign the application furnished by the association, state age and residence,

and answer truthfully the questions propounded by the association in his or her application in regard to health and habits; and any false statement in regard to age, habits or character, or any evasion or deception whatever, will debar such applicant from any of the privileges or benefits of this association.

"Sec. 3. All applicants must be persons of sound health, good moral character, sober, and competent to gain a livelihood."

We suppose that the contracts to pay benefits to the beneficiaries of deceased members are unquestionably insurance; but are not the contracts to pay endowments to living members also insurance? The amount agreed to be paid to living members is much more than they have paid into the association, including interest, and must come, partly at least, if it ever comes, from assessments paid by other members, whose memberships have been forfeited and have lapsed; and this amount agreed to be paid to living members is in such a condition that it could not be sold or seized in execution or attached or garnished while it is maturing, nor at any time before it has become absolutely due; and if the member should die at any time while it is maturing, nothing would go to his or her executor or administrator, or become a part of the assets of his or her estate. Said chapter 131, § 9, recognizes such endowments as insurance; so, also, do the decisions of courts and the elementary authorities on insurance. In the case of *Briggs v. McCullough*, 36 Cal. 542, 550, 551, the following language is used:

"The term 'life insurance' is not alone applicable to an insurance for the full term of one's life. On the contrary, it may be for a term of years, or until the assured shall arrive at a certain age. It is simply an undertaking on the part of the insurer that either at the death of the assured, whenever that event may occur, or on his death, if it shall happen within a specified term, or before attaining a certain age, as the case may be, there shall be paid a stipulated sum. In either form it is, strictly speaking, an insurance on the life of the party. . . . The fact that the company is to pay the agreed sum at the expiration of ten years, even though McCullough shall not have died in the meantime, does not divest it of its character of life insurance." (See, also, *Charter v. John Han-*

*cock Mut. Life Ins. Co.*, 127 Mass. 153 ; Bliss on Life Ins., § 6 ; May on Ins., § 344*b*.)

We also understand that contracts to pay endowments to the living members of an association, company or society, are generally at the present time recognized by persons having connections with life insurance business and others as insurance contracts ; and if such is the case, it would seem to follow that the title to chapter 131 is broad enough to permit the legislature to insert in the act, as it did, provisions relating to such endowment contracts, although under the old definitions of life insurance these endowment contracts might not be considered as coming strictly within the business of life insurance. But taking the clearly-expressed intention of the legislature as found in the act itself, the decisions of the courts relating to endowment insurance, the opinions of authors on life insurance, and the prevailing opinion of people connected with life insurance, and of people in general, we think the contracts in the present case to pay certain sums of money as endowments to living members are insurance, as well as the contract to pay certain other sums of money as benefits to the beneficiaries of deceased members. And this being our opinion, we think that chapter 131 is not unconstitutional or void, so far as it has application to this case, for the reason that its title is too narrow, limited, or circumscribed. But it is claimed, however, that the act is unconstitutional for other reasons than that the title to the act is not broad enough to include contracts for the payment of endowments. It is claimed, for instance, that the act is unconstitutional and void, so far as it applies to the defendant, for the reason that it changes or abrogates some of the provisions of its charter. Now such legislation is permissible in this state under our constitution. The defendant in the present case was organized as a corporation on January 7, 1885, under the general incorporation laws of the state of Kansas, and chapter 131, which took effect March 14, 1885, is also a general law ; and the legislature clearly has the right by general law to change, alter or repeal any portion of the general laws

of Kansas, whether they relate to corporations, or not. Section 1, article 12, of the constitution of Kansas, provides as follows:

"SECTION 1. The legislature shall pass no special act conferring corporate powers. Corporations may be created under general laws; but all such laws may be amended or repealed."

And under these provisions of the constitution, the legislature undoubtedly has the right to do all that it has done in the present case. (*Greenwood v. Freight Co.*, 105 U. S. 13, and cases there cited.)

It is further contended that the act is unconstitutional for still other reasons, but we do not think that any of such contentions can be maintained. (*The State, ex rel., v. National Association*, ante, p. 51.)

The judgment of the court below will be affirmed.

JOHNSTON, J., concurring.


HORTON, C. J.: I confess I cannot understand the workings of the endowment and benevolent association, if it is only a "loaner of money" and intends to be fair and honest in all of its representations and dealings. Why there should be so many lapses or forfeitures in the business of merely loaning money in a sound and solvent corporation, as is estimated by its officers, is difficult to conceive. If the theory of its counsel is correct, the association lives upon the misfortunes of its members, rather than upon the safe and successful investment of its funds. If the purpose of the company be interpreted by its charter and by-laws, it is nearer an insurance company than a loan company. A person to become a member must be of sound health, good moral character, temperate habits, and competent to gain a livelihood. Every applicant for membership must answer truthfully all questions propounded by the association in his or her application in regard to health and habits, age and character; and any member forfeits all benefits in the association if he or she makes any false statement, conceals or evades any fact in regard to his or her personal history or condition of health. If an

early death is no more disastrous to the corporation than one more remote, why must an applicant, to become a member, be of sound health and endowed with all the qualities for a long life?

I concur in the judgment rendered, with some doubts, however, whether the business of the association comes strictly within the provisions of chapter 131, Laws of 1885.